IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

D & J DRILLING, LLC,

                        Plaintiff,

    vs.                                                            CIVIL NO.  13-776 LFG/KBM

FIRST LIBERTY ENERGY, INC.,

                        Defendant.

**MEMORANDUM OPINION AND ORDER
DENYING DEFENDANT'S MOTION TO DISMISS
<u>FOR LACK OF PERSONAL JURISDICTION</u>**

      THIS MATTER is before the Court on "Defendant's Motion to Dismiss for Lack of Personal Jurisdiction" [Doc. 4].  The Court considered the Motion, Plaintiff's Response in Opposition [Doc. 7], and Defendant's Reply [Doc. 10].  In accord with D.N.M.LR-Civ. 7.6(a), the motion may be resolved on the parties' written submissions.  Accordingly, oral argument is not necessary.

<u>**Introduction**</u>

      This lawsuit arises, in part, from Plaintiff D&J Drilling's ("D&J") allegations that Defendant First Liberty Energy, Inc. ("First Liberty") failed to pay D&J a sum in excess of $500,000 owed to D&J in relation to the parties' written drilling contract. [Doc. 1-1 at ¶¶ 6, 14, 30, 38.] On July 11, 2013, D&J filed a complaint against First Liberty for breach of contract in San Juan County, Eleventh Judicial District Court in the State of New Mexico.  [Doc. 1-1.] On August 20, 2011, First Liberty removed the breach of contract lawsuit to federal court based on diversity jurisdiction.

      On August 27, 2013, First Liberty moved to dismiss the lawsuit under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction.  In support of this position, First Liberty relies on the affidavit of its President and CEO that it is a Florida corporation that began its business in 2000 in

Florida, and has minimal, if any, contacts with New Mexico.  [Doc. 4-1 (Dan Beecroft ("Beecroft") Aff.) at ¶ 3.] From 2002 to 2012, First Liberty's only business was drilling oil and natural gas wells in Oklahoma. [Id. at ¶ 4.] In 2012, First Liberty planned a drilling project in Colorado ("Colorado drilling project"). [Id.] The question whether this Court has personal jurisdiction over Defendant depends on First Liberty's activities in relation to this oil and gas drilling project, and an analysis of New Mexico's long-arm statute.

D&J urges that First Liberty has sufficient minimum contacts with New Mexico to allow this Court to assert personal jurisdiction.  In support of its position, D&J also relies on affidavit statements, along with  language in a written drilling contract signed on February 12, 2013, by Beecroft.  [Doc. 7-1.]

### Legal Standard

"Personal jurisdiction is established by the laws of the forum state and must comport with constitutional due process."  Fireman's Fund Ins. Co. v. Thyssen Min. Const. of Canada, Ltd., 703 F.3d 488, 492-93 (10th Cir. 2012) (citation omitted) (interpreting New Mexico law).  New Mexico's long-arm statute allows for imposition of jurisdiction against an extraterritorial party who transacts business in this state.  The statute specifically provides for personal jurisdiction over "[a]ny person, whether or not a citizen or resident of this state, who ... submits himself or his personal representative to the jurisdiction of the courts of this state as to any cause of action arising from ... the transaction of any business within this state." NMSA 1978 § 38–1–16(A)(1).

In Fireman's Fund, the Tenth Circuit Court of Appeals analyzed the issue of personal jurisdiction under the laws of New Mexico and explained that "New Mexico's long-arm statute, N.M. Stat. Ann. § 38–1–16 (1971), 'is coextensive with constitutional limitations imposed by the Due Process Clause.'" Id. (citing Trujillo v. Williams, 465 F.3d 1210, 1217 (10th Cir. 2006)).  In

other words, the long-arm statutory requirements effectively collapse into the second, constitutional, analysis concerning due process.  Silver v. Brown, 382 F. App'x 723, 728 (10th Cir. June 14, 2010) (unpublished) (citation omitted).  The New Mexico Court of Appeals recently observed that "it is no longer necessary to determine whether a defendant has committed one of the acts enumerated by our long-arm statute."  M.R. v. SereniCare Funeral Home, L.L.C., 296 P.3d 492, 494-95 (Ct. App. 2012), *cert. denied,* 299 P.3d 862 (N.M. Jan 2, 2013).  Instead, the Court undertakes "a single search for the outer limits of what due process permits."  Id. (citation omitted).

While personal jurisdiction can be general[1] or specific, in this case, D&J contends the Court has personal jurisdiction over First Liberty.  [Doc. 7 at 9.]  In discussing due process requirements for personal jurisdiction, the Tenth Circuit Court stated:

> Personal jurisdiction over a nonresident defendant satisfies due process if there are sufficient "minimum contacts between the defendant and the forum State." World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291 (1980) (quotations omitted); Intercon [v. Bell Atl. Internet Solutions, Inc.], 205 F.3d [1244,] at 1247 [(10th Cir. 2000)]. The minimum contacts may support specific jurisdiction or general jurisdiction. Id.

Fireman's Fund, 703 F.3d at 492-93.  The Tenth Circuit Court further noted that:

> . . . the defendant must have sufficient minimum contacts with the forum state, and jurisdiction over the defendant cannot offend "traditional notions of fair play and substantial justice." Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., Solano Cnty., 480 U.S. 102, 113 (1987). The minimum contacts must show that "the defendant 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State.'" Id. at 109 (quotations omitted). The contacts with the forum must make being sued there foreseeable so that the defendant could "reasonably anticipate" the suit.

---

[1]To establish "general jurisdiction," a party must show the defendant has contacts with the forum "so 'continuous and systematic' as to render [it] essentially at home in the forum State."  Monge v. RG Petro-Mach. (Group) Co. Ltd., 701 F.3d 598, 614 (10th Cir. 2012) (citation omitted).  There are no allegations of general jurisdiction here.

World–Wide Volkswagen, 444 U.S. at 297. The litigation must "result[ ] from alleged injuries that arise out of or relate to those activities." Intercon, 205 F.3d at 1247 (quotations omitted).

Id., 703 F.3d at 493.

Stated differently (*albeit* in the context of a tort analysis), "the Supreme Court has instructed that the 'minimum contacts' standard requires, first, that the out-of-state defendant must have 'purposefully directed' its activities at residents of the forum state, and second, that the plaintiff's injuries must 'arise out of' defendant's forum-related activities." Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1071 (10th Cir. 2008) (*quoting* Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). The exercise of personal jurisdiction over a non-resident defendant must be "consonant with traditional notions of fair play and substantial justice." Id. *See also* Tercero v. Roman Catholic Diocese, 132 N.M. 312, 316 (2002).

## Analysis

### I.      Facts as Set Forth in Affidavits and Drilling Contract:

First Liberty argues, through President/CEO Beecroft's affidavit, that it is a Florida corporation with its principal offices in that state and no presence in New Mexico.  It does not maintain a New Mexico corporate office, New Mexico address, or New Mexico telephone number. It owns no property in New Mexico and has no assets here.  First Liberty has never sought authority through the New Mexico Secretary of State or the State's Public Regulatory Commission or any other State agency to do business in this state.  It has no agent for service of process here.  First Liberty has no parent, sibling corporation or subsidiary in New Mexico, has never been a party to litigation in this state, has never advertised in the state, and has never been listed in the New Mexico yellow or white pages.  Neither Beecroft nor any of First Liberty's employees have ever been to New Mexico. [Doc. 4-1, Beecroft Aff.]

4

However, at issue are First Liberty's activities in relation to the 2012 Colorado drilling project. First Liberty admits that it hired Peterson Energy, a Colorado-based engineering group, to oversee and manage the oil and gas drilling project in Colorado. [Id. at ¶ 6.] Peterson Energy identified and contacted D&J to determine its suitability to drill the well in Colorado for First Liberty. D&J is a limited liability company with its principal place of business located in Farmington, New Mexico. [Doc. 1, Exhibit.]

According to First Liberty, D&J is the contractor chosen by Peterson Energy and Peterson Energy performed all contract negotiations with D&J, except for Beecroft's review of the written drilling contract that was emailed to him for his signature. Beecroft, while in Florida, admits that he signed the contract with D&J and that he returned the contract by email. [Doc. 4-1 at ¶¶ 9-10.] Beecroft states there were "very few e-mails with anyone from New Mexico" regarding the Colorado drilling project – "no more than 5." [Id. at ¶ 11.] Beecroft asserts that the D&J drilling contract was the only contract First Liberty has ever had with a New Mexico resident or company. [Id. at ¶ 13.]

Beecroft further contends that the D&J contract was supposed to be performed entirely in Colorado. He acknowledges, however, that D&J moved its equipment and personnel to Colorado from New Mexico to perform drilling work on the Colorado drilling project. Beecroft notes that D&J claims it "demobilized its equipment, moving it from Colorado back to New Mexico, and charged for demobilization under the contract." On one occasion, a worker on the project or a friend of the worker in New Mexico volunteered to visit D&J's property in New Mexico to see if the equipment was returned to New Mexico. [Id. at ¶¶ 29, 31.]

Under the terms of the drilling contract [Doc. 7-1 at 1], First Liberty, as "operator," engaged D&J as an independent contractor to drill an oil and gas well designated as Basin #1 located in Rio Grande County in the State of Colorado.  The drilling contract further provides in relevant part:

> Contractor [D&J] shall furnish equipment, labor, and perform services as herein provided, for a specified sum per day under the direction, supervision and control of operator (inclusive of any employee, agent, consultant or subcontractor engaged by operator to direct drilling operations).

[Id.]  Drilling operations were to commence in Colorado by March 1, 2013, or on a date based on D&J's drilling rig availability.  First Liberty was to pay a daily mobilization fee and, as operator, was responsible for all trucking cost of rig equipment, "move in & rig up . . . .".  [Id.]  Operator First Liberty also was to pay demobilization fees.  Demobilization included "load rig & move to D&J drilling yard" in Farmington, New Mexico or "equal distance."  [Id.]  Payments were to be sent by First Liberty to D&J in New Mexico. [Id. at ¶ 24.]

First Liberty and D&J agreed that the contract was to "be construed, governed, interpreted, enforced, and litigated, and the relations between the parties determined in accordance with the laws of New Mexico."  [Id. at ¶ 18.] The contract is signed both by Beecroft on behalf of operator First Liberty and by Clarence D. Keenom ("Keenom"), owner of contractor D&J. [Id. at ¶ 24.]

According to Keenom's affidavit, First Liberty transacted business in New Mexico by sending its agent, Peterson Energy, into New Mexico to inspect drilling equipment, discuss the nature of the drilling work to be done, and possible service fees to be charged for the drilling operations on the Colorado drilling project.  Keenom states that Peterson Energy contacted him on behalf of First Liberty for purposes of work on the Colorado drilling project. [Doc. 7-1 at ¶¶ 7, 9, 10, 11.] After inspection of D&J's equipment in New Mexico, Keenom was told by Peterson Energy employees that a contract for the work would have to be executed with First Liberty.  Keenom stated

that because he had never worked with First Liberty, he sought and received several credit references from First Liberty before execution of the contract.  Keenom received the credit references in New Mexico.  Keenom prepared a contract and sent it to Beecroft for his review.  The contract sent by D&J had additional terms negotiated via several telephone calls and emails between First Liberty and D&J.  Keenom sent all communications about the contract from New Mexico to Florida, and he signed that contract was signed in New Mexico. [Id. at ¶¶ 13-19.]  D&J did not sign a contract or agreement with Peterson Energy for work on the Colorado drilling project.  Rather, the only contract D&J signed relating to the Colorado drilling project was with First Liberty.  During the drilling work, D&J purchased supplies in New Mexico.  D&J prepared and sent an invoice for services to Beecroft in Florida, and discussed payment of the invoiced amounts with Beecroft by telephone.  All communications about payments were sent and received by Keenom while in New Mexico.  First Liberty was to have paid D&J by remitting payment to D&J at a New Mexico address although First Liberty allegedly failed to make payment. [Id. at ¶¶ 22, 25, 26-30.]

Andrew Peterson, with Peterson Energy, supplied an affidavit that affirms Keenom's testimony.  He stated that First Liberty hired Peterson Energy to oversee the operations of the Colorado drilling project and locate competent contractors to perform services.  Peterson Energy was directed by Beecroft, on First Liberty's behalf, to locate and investigate a drilling contractor capable of the work. [Doc. 7-2 at ¶¶ 1-5.] Peterson Energy contacted D&J in New Mexico via telephone.  Several Peterson Energy employees went to New Mexico to inspect D&J's drilling equipment and discuss the project in Colorado.  Peterson reported the results of Peterson Energy's inspection of D&J's equipment and related discussions to Beecroft and recommended that Beecroft select D&J.  Beecroft agreed with the recommendation and directed Peterson Energy to request that

D&J prepare a contract for services.  Peterson Energy was not involved in negotiating the terms of the contract between D&J and First Liberty. [Id. at ¶¶ 8-16.]

## II.     First Liberty's Position:

First Liberty argues it did not transact business in New Mexico, as set out in NMSA § 38-1-16(A)(1), and that traditional notions of fair play and substantial justice dictate that the Court lacks personal jurisdiction over it.  First Liberty contends that Peterson Energy played the main role in contracting with D&J, and that First Liberty had only "attenuated contacts" with New Mexico. [Doc. 4.]

With respect to the choice of law provision in the drilling contract, First Liberty asserts that it is not a forum selection clause and, further, that the clause is insufficient to establish personal jurisdiction under the circumstances of this case.  In addition, First Liberty urges that a contract with a non-resident party cannot, standing alone, establish sufficient minimum contacts with the forum state.

First Liberty contends it did not initiate the drilling contract with D&J, did not enter into the transaction in New Mexico, and did not perform any of the contract in New Mexico.  In addition, First Liberty posits that D&J cannot use the activities of Peterson Energy "as means to transport First Liberty to New Mexico for this litigation." [Doc. 4 at 8.] Nor can D&J's actions in performance of a contract cause First Liberty to have purposefully availed itself in New Mexico.

## III.    D&J's Position:

D&J argues that the complaint in this case makes clear that the dispute revolves around First Liberty's alleged breach of terms of the contract that First Liberty negotiated and executed with D&J.  According to D&J, First Liberty initiated the contract by requesting that Peterson Energy, First Liberty's agent and project consultant, make contact with D&J in New Mexico.  The complaint

alleges that during contract negotiations, First Liberty sent a copy of the application of the drilling permit to D&J in New Mexico.

D&J asserts that First Liberty "purposely directed" its business activities at a New Mexico LLC when it directed its agent to initiate contact with D&J regarding work on the Colorado drilling project. D&J contends that taken as a whole, the allegations regarding the negotiation and execution of a contract between D&J and First Liberty favor a finding of personal jurisdiction. D&J further argues that First Liberty should not be allowed to disavow the activities that its agent Peterson Energy undertook on its behalf. Peterson Energy was acting under the direction and control of First Liberty when it investigated and recommended D&J for First Liberty's work on the Colorado drilling project. In other words, it was First Liberty's decision to employ Peterson Energy to locate a drilling operator for the work and, ultimately, to select D&J for the job.

### IV.    Discussion:

Through the series of events evidenced by the affidavits, the Court finds that First Liberty willingly, through its agent Peterson Energy and through its own President and CEO, Beecroft, engaged in business transactions in New Mexico sufficient to satisfy requirements of New Mexico's long-arm statute. While true that First Liberty has no physical presence in New Mexico, it voluntarily chose to hire a New Mexico business to drill a well. The fact that this may have been a single contract, rather than an ongoing series of contractual engagements, is not determinative of the personal jurisdiction inquiry. Even a single transaction can be sufficient. McIntosh v. Navaro Seed Co., 81 N.M. 302, 304 (1970) ("A single transaction negotiated, or to be performed, within the forum can be sufficient contact" to establish personal jurisdiction).

Moreover, while there was a single contract, there were multiple contacts with D&J, a New Mexico business, including contact through First Liberty's agent, Peterson Energy and its

employees, as well as telephone contacts with D&J in New Mexico and inspection of equipment in New Mexico.  There were at least five emails between the parties, as conceded by First Liberty, and other communications between D&J in New Mexico and First Liberty in negotiating and executing the contract.  Billings were made by D&J from New Mexico; payments were to be made to D&J in New Mexico.  These contacts between First Liberty and D&J occurred in the forum state.

A contract for business alone may not be sufficient to satisfy the minimum contacts required for personal jurisdiction.  But, negotiations between an out-of-state business with a New Mexico company that later resulted in a contract is part of the personal jurisdiction inquiry.  If the defendant's presence within the forum "was casual and the transaction of business was wholly fortuitous," this would not weigh in favor of finding personal jurisdiction.  *See* Hunter-Hayes Elevator Co. v. Petroleum Club Inn Co., 77 N.M. 92, 96 (1966).  However, here, First Liberty's transaction with D&J was not "casual" or merely "fortuitous."  First Liberty signed a written contract with D&J, a New Mexico company.  D&J signed the contract in New Mexico, used equipment from New Mexico, submitted invoices from New Mexico, and expected payment be made to an address in New Mexico.  Based on the above discussion, along with affidavit statements, the Court concludes  that First Liberty transacted business in New Mexico for purposes of the long-arm statute.  Thus, D&J satisfied its burden of demonstrating minimum contacts.  However, this does not end the inquiry.

Once D&J satisfied its burden, First Liberty has the burden to demonstrate that exercising personal jurisdiction would nonetheless "offend traditional notions of fair play and substantial justice."  Newsome v. Gallacher, 722 F.3d 1257, 1271 (10th Cir. 2013) (*citing* Dudnikov, 514 F.3d at 1080) (internal quotation marks omitted).  The Tenth Circuit Court observed that  "[s]uch cases are rare."  Id. (*citing* Rusakiewicz v. Lowe, 556 F.3d 1095, 1102 (10th Cir. 2009)).  In Newsome,

the Tenth Circuit Court further noted that a defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. (citing Burger King, 471 U.S. at 477).

The Court looks to federal law requirements of due process in deciding the second inquiry. See, e.g., Sproul v. Rob & Charlies, Inc., 304 P.3d 18, 23-24 (Ct. App. 2012) (noting that question of personal jurisdiction hinges on federal law). The New Mexico Court of Appeals provided the following guidance on this question:

> The United States Supreme Court has clarified that "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." . . . Whether or not personal jurisdiction exists over a particular defendant is decided on a case-by-case basis. See Gray v. Am. Radiator & Standard Sanitary Corp., 22 Ill.2d 432, 176 N.E.2d 761, 765 (1961) ("The question cannot be answered by applying a mechanical formula or rule of thumb but by ascertaining what is fair and reasonable [under] the circumstances."), abrogated on other grounds as recognized by Telular Corp. v. Mentor Graphics Corp., 282 F. Supp. 2d 869 (N.D.Ill. 2003).

Id. at 25 (citations omitted).

The due process determination is made by balancing five factors: the burden on the defendant, New Mexico's interest, the plaintiff's interest, the interest in an efficient judicial system, and the interest in promoting public policy. Burger King, 471 U.S. at 476–77. Clearly, D&J has a strong interest in bringing this lawsuit in New Mexico where it resides and where it claims the breach of contract occurred based on First Liberty's alleged failure to make payment to D&J at an address in New Mexico.

While First Liberty is burdened, to some extent, in being required to litigate in New Mexico, it agreed to a choice of law provision that explicitly provided that New Mexico law governed. The contractual choice of law language was agreed to and executed by First Liberty and D&J. It other

11

words, First Liberty and D&J mutually elected to apply New Mexico law in interpreting, enforcing

and litigating disputes.  The Restatement (Second) of Conflict of Laws, § 187, notes that with some

minor limitations, parties may designate their choice of law to govern contractual disputes.  In

Yavuz v. 61 MM, Ltd., the Tenth Circuit held:

> . . . parties to a contract are empowered to and frequently do choose
> a particular state's law to apply to the execution and interpretation of
> the contract.  Absent special circumstances, courts usually honor the
> parties' choice of law because the "prime objectives" of contract law
> are to "protect the justified expectations of the parties and to make it
> possible for them to foretell with accuracy what will be their rights
> and liabilities under the contract."

465 F.3d 418, 428 (10th Cir. 2006) (citations omitted).

First Liberty could have insisted on a different choice of law provision, *e.g.*, Colorado or

Florida. But, it did not.  It signed a contract agreeing that the governing law would be New Mexico.

[Doc. 7-1.]  While the parties did not explicitly set out a choice of forum clause, it can be reasonably

inferred that they chose to litigate in the forum where laws would apply.  Indeed, that is exactly what

occurred in C.L. Enter., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla., 532 U.S. 411, 419-

420 (2001).  In that case, the Tribe entered into a construction contract to install a roof on a building

owned by the Tribe.  The contract provided that it was to be "governed by the law of the place where

the project is located."  The project was in the State of Oklahoma and, following a dispute between

the parties, the builder sought to sue the Tribe in an Oklahoma State court.  The Tribe balked,

contending it had immunity from suit in that forum.  The Supreme Court unanimously found that

the parties' choice of law agreement had the <u>effect</u> of agreeing to litigation in the Oklahoma State

court.

In the present case, notwithstanding the lack of a forum clause, the agreement to use New

Mexico law to interpret, enforce and litigate disputes certainly gives the appearance that the parties

intended to avail themselves of the New Mexico courts in the event of a dispute.  In other words, the parties contemplated litigation in New Mexico.  First Liberty did not draft the contract, but reviewed and signed it.  Thus, First Liberty should not be heard to complain that this dispute is before a New Mexico court.

While First Liberty implies that Colorado should be the forum to hear this lawsuit, it is not clear why Colorado would be more convenient to First Liberty than New Mexico.  First Liberty did not establish that it has offices or employees in Colorado.  Moreover, Colorado borders New Mexico in terms of convenience of location.  *See* Newsome, 722 F.3d at 1273 (finding no particular burden on the defendant to travel from Alberta to Oklahoma for purposes of the lawsuit).  In addition, First Liberty provides no persuasive reason why Colorado somehow would provide a more efficient resolution of this controversy where New Mexico law is to be applied.

The Court further finds that New Mexico has an interest in this matter based on the choice of law provision, First Liberty's voluntarily decision to hire a New Mexico company, and the alleged injury to a New Mexico business.

The last factor to consider is the "shared interest of the several states in furthering fundamental substantive social policies."  *See* Intercon, 205 F.3d at 1249.  "Key to this inquiry are the location of witnesses, where the wrong underlying the lawsuit occurred, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation."  Newsome, 722 F.3d at 1274 (citation omitted).

The location of witnesses factor does not weigh heavily in favor of either side, as it appears that some witnesses would be located in New Mexico, Colorado, and Florida.  The same is somewhat true with the location of the alleged injury.  Depending on the party's view, it may have occurred either in New Mexico where payment was not made or in Colorado where the project was

13

located.  The Court already discussed that the parties agreed New Mexico law applied to resolution of the dispute.  Thus, that factor weighs in favor of D&J's position.  The last factor does not clearly weigh in favor of any location.  On balance, most of these subfactors are neutral with the exception of the choice of law provision in the contract that favors New Mexico.

<u>Conclusion</u>

The Court concludes that D&J satisfied its burden in demonstrating the existence of minimum contacts between First Liberty and New Mexico.  First Liberty purposefully directed its activities at a New Mexico resident through the use of its agent's investigation and assistance in recommending First Liberty employ a New Mexico business.  In other words, First Liberty initiated business with a New Mexico company and negotiated terms and content of a written contract with D&J.  It should reasonably have anticipated being haled into court here.  Thus, First Liberty purposely availed itself of the jurisdiction of New Mexico courts.

In contrast, First Liberty did not carry its overall burden of convincing the Court that New Mexico jurisdiction would offend fair play and substantial justice.  First Liberty simply did not present "a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  After examining the parties' negotiations and contemplated future consequences, the terms of the contract, and the parties' actual course of dealing, along with the pertinent factors with respect to due process, the Court concludes that it has specific or personal jurisdiction over First Liberty.

IT IS THEREFORE ORDERED that Defendant's Motion to Dismiss for Lack of Personal Jurisdiction [Doc. 4] is DENIED.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge

14